IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANTHONY WINSTON UCKELE,

    Petitioner,

  v.

WILLIAM KNIPP,

    Respondent.

No. C 12-04969 WHA

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

In this habeas action filed by a state prisoner, the petition is **DENIED**.

## STATEMENT

Petitioner Anthony Winston Uckele is currently confined at Mule Creek State Prison in Ione, California. Pursuant to 28 U.S.C. 2254, he has filed a petition for writ of habeas corpus challenging a conviction in California state court.

Petitioner was charged with 36 counts of lewd and lascivious acts on a minor under the age of 14 pursuant to Section 1203.066 of the California Penal Code. The alleged victim in all

counts was the same. On December 19, 2007, the jury found petitioner guilty of counts 1 through 10, and found the substantial sexual conduct allegations true as to counts 1 and 2. On December 27, 2007, the jury found petitioner guilty of counts 11 through 20, left the verdict forms blank as to the substantial sexual conduct allegations attached to counts 3 through 20, and did not reach a verdict on counts 21 to 36. The trial court declared a mistrial as to counts 21 to 36. On March 14, 2008, the trial court sentenced petitioner to 44 years in state prison (Exh. 1 at 339–368, 576–577, 665, 705–709). Unless otherwise specified, citations herein to "Exh." are to the exhibits lodged with respondents' answer.

The California Court of Appeal affirmed (Exh. 6 at 2). On April 27, 2011, the California Supreme Court denied a petition for review (Exh. 8). On October 3, 2011, the Supreme Court of the United States denied a petition for writ of certiorari (Exh. 10). Petitioner timely filed the instant federal habeas petition on September 24, 2012.

The following background facts are taken from the opinion of the California Court of Appeals:

> K. was 12 years old in September 2005. She had a publicly viewable profile on MySpace. Her profile contained a photograph of her and inaccurately stated that her age was either 14, 15 or 16. On September 29, 2005, K. received a message through MySpace from defendant. His message read: "I can't believe you're single, here's my number." His message included his telephone number and a link to his MySpace profile. K. looked at defendant's MySpace profile. There were no photos of him, but his profile stated that he was 16 or 17 years old. K. telephoned defendant and talked to him. He wanted to meet her, so they arranged to meet the next afternoon at a Starbucks.
>
> When they met up at Starbucks, defendant greeted her with a hug. Defendant then drove her in his car to a video arcade. They played video games for a while before they decided to go to a park. Defendant drove them to a park. He took a sleeping bag out of the trunk of his car, took it into the park, opened it, and placed it on the ground. The two of them lay down on the sleeping bag. Defendant wrapped his arms around K. and gazed into her eyes. He told her she had "really pretty eyes." Defendant began kissing her on the lips. After about an hour of this activity, they decided that K. needed to get home. Defendant drove her to a block from her house and let her off. He did not take her to her house because she had told him that her "dad is very strict" and would not want her to be "seeing a guy."
>
> They got together again within the next week. This time, defendant told her that he was "actually 22" years old. K. was a little surprised because he looked 16 or 17 years old. K. responded by telling him that she was 13, and, later that day, after they had engaged in more hugging and kissing, she told him she was actually only 12. She had been reluctant to tell him she was 12 because "I was paranoid that I wouldn't get a chance to date anybody because I was too young." When K. told defendant that she was 13, he was "a bit surprised but he wasn't against it." When she told him she was

2

actually 12, he "seemed to be okay with it." Defendant admonished her that she "can't tell my friends about him because he's too old."

During the first month of their relationship, K. and defendant got together once or twice a week and spoke on the telephone a few times a week. They would meet at Starbucks and then go to the park where they would lie down on defendant's sleeping bag and hug and kiss. They went to the park six to 12 times and spent one to three hours there on each occasion. The kisses progressed "after awhile" to "open mouth" kisses during which defendant put his tongue in K.'s mouth. Defendant told K. that he "loved" her and that he "wanted to keep dating" her. K. trusted defendant and told him that she loved him.

After the first month, defendant asked K. to "sneak out" of her house at night. She did so on a night in late October, and he met her near her house and drove her to his house. He told her to be quiet because his mother was asleep. They went up to defendant's bedroom and sat on his bed. He began kissing her and hugging her and repeatedly asked her to take off various pieces of her clothing. She eventually did so. Then he asked her "if I wanted to have sex." She said "no." Defendant told her "[y]ou are going to enjoy it, don't worry." He kept asking until she agreed to have sex. They had sexual intercourse. After he had penetrated her, she insisted that he stop and put on a condom. He did so, and they resumed sexual intercourse. After that, defendant hugged and kissed K. for a while and then they had intercourse again.

Within a week of this sexual encounter, they met again and did the same things. Their relationship continued until April 2006. Defendant would "[o]ccasionally" tell K. not to tell anyone about him "because the relationship that we have is illegal." He also told her that he found "exciting" the fact that she was 12 while he was 22. The last time K. saw defendant was on April 11, 2006, the day after her 13th birthday. Defendant told her that he was going into an alcohol and drug rehab program the next day. She understood that he would be in rehab for a month or two.

K. subsequently read "a book on sexual assault." The book described a situation "that was very similar to what was happening to me." This caused her to think "that maybe what was happening wasn't right." In early May 2006, during a group therapy session, another girl "brought up sexual assault." That prompted K. to tell her therapist about her relationship with defendant. K.'s therapist told K.'s mother, and K.'s mother took K. to the police department to make a report.

After her initial report to the police, K. was interviewed by San Jose Police Sergeant Richard Benitez on May 25, 2006. K. told Benitez that defendant "molested me." She explained that they had met on MySpace. Defendant's profile said he was 16 or 17. They talked on the phone and arranged to meet the next day. They met the next day and went to Starbucks, the video arcade, and the park. At the park, defendant began kissing her "just on the lips." They had similar meetings once or twice a week for about a month. At their second meeting, defendant told her that he was actually 22 years old. Each time they met, defendant hugged and kissed her.

After several weeks, defendant asked her to sneak out at night. She did so and met up with defendant. He kissed her "a lot" and told her he was going to take her to his house. He took her to his home where they sat on the bed in his bedroom, and he hugged her. Defendant asked her to remove her clothing. She did so. He took off his clothes and asked her to have sex. She declined, but he kept "pressuring" her and was able to persuade her to have sex. They had sex one time that night. K. told Benitez that their sexual relationship had continued until April 11, 2006. They met once or twice a week and had sex "one to three times" each time. Usually they had sex in his bedroom,

3

but three or four times they had sex in her bedroom. Several times, defendant told her "'[t]his is illegal, so don't tell anybody about me.'"

On June 7, 2006, K. made a recorded telephone call to defendant in Benitez's presence. Defendant immediately asked K. why she had not been talking to him recently. K. said she had read a book on sexual abuse. Defendant asked if she was thinking she "should put me in jail." He said: "Um, well you can't tell anyone or else I go bye-bye for a long, long time." K. said: "I'm only thirteen and you're like twenty-three." Defendant responded: "Yes. True." Defendant asked K. if she was saying "[t]hat you don't wanna see me, because I'm older than you." K. replied: "I don't know, I feel bad 'cause you're twenty-three and we had sex." Defendant responded: "But so?" K. mentioned that she "could tell someone." Defendant said: "Tell someone? You, you know you'd really fuck my life up if you did that?" "[A]nd you promised me you wouldn't do that." "Or I never would have had anything to do with you in the first place. That's the only reason we did have something. Is 'cause you didn't, you wouldn't say anything." K. told defendant that he had "already fucked me up." Defendant complained: "Just because I was the first one to ever show you love? I'm, I'm the one that fucked you up?" K. responded: "Well, it's just that you're too old, and you had sex with me." Defendant said: "Okay. That was something, I didn't force you to do anything." When K. tried to terminate the call, defendant pleaded with her "[p]lease don't do this to me. If you're, if you don't wanna see me anymore, that, I can deal with that. I do care about you." "But if you tell someone, I'm, I lose my (inaudible), okay? I go to prison for like ten years." "Please do not do this to me. You will ruin my life. Don't do that." "And if you wanna talk, you can call me whenever. But just don't, just do anything but tell someone. You cannot do that. I will have no fuckin' future. I will, I will be killed in prison. You will, I will end my life, you will end my life if you fuckin' tell an adult. Don't do, please don't do that to me." "You can't, or I'm fuckin' at, like I will like, I'll go to jail and then like I'll probably be killed in there."

[Detective] Benitez went to defendant's home with a search warrant in June 2006. He talked to defendant's mother. She told Benitez that she was aware of defendant's interest in teenage girls. Defendant's mother told Benitez that, three years earlier, defendant had told her "that he had what he thought was a sickness." Defendant had told her that "he was interested in young girls and wanted to have sex with them." She had advised him to see a therapist and get counseling, but he had replied: "'I can't do that because if I go disclose what I am thinking to a therapist that they'll lock me up.'" Defendant's mother told Benitez that defendant had brought "underage girls" to their home several times, and she "would kick them out of the house." She said that "it would become a routine to check the identification cards" of any girls defendant brought to the house to ensure that they were adults. Defendant's mother told Benitez that she had seen defendant looking at pictures of younger girls on MySpace. She said: "'I knew he was being a predator.'"

During the execution of the search warrant, the police seized defendant's computer. A forensic search of defendant's computer's hard drive turned up numerous images of young girls. One of these images was of a young girl who appeared to be 14 wearing "very short" shorts. Another was of a girl of similar age lying on a trampoline and wearing a halter top and "short" shorts. Three images of K. were found on defendant's computer, and these images had been created between September 30, 2005 and January 2006. Telephone records showed dozens of calls between defendant and K. each month from October 2005 through April 2006. Most of the calls were from defendant to K.

\*        \*        \*

4

Defendant's trial counsel conceded in his opening statement at trial that defendant was guilty of two counts of lewd conduct because he had engaged in sexual intercourse twice with K. He asserted that the remaining 34 counts would not be proven by the prosecution beyond a reasonable doubt because they were based on K.'s "exaggerations."

At trial, K. testified that she and defendant met up "[a]bout 48 or more" times between their first sexual encounter and April 2006. "[O]n average I would meet him about two times a week." "About 70 percent of the time," these were nighttime meetings. She testified that five to 10 of their sexual encounters occurred in her bedroom. On other occasions they had sex at his home or in his car, and a few times they had sex in a gas station bathroom. K. testified that she "did the math" and estimated "that if he was to have sexual intercourse with me two times a week and if those two times each day he would have sex two times then the total would have been 104 times." She testified that she had orally copulated defendant "20 to 60" times. Once, in his car, defendant put his fingers in K.'s vagina. Twice, once in his bedroom and once in her bedroom, defendant put his penis in K.'s anus. When they last met on April 11, 2006, they had sex in his car.

Her interview with Benitez was played for the jury at trial. In that interview, K. had told Benitez that she had orally copulated defendant, he had put his fingers in her vagina, and they had twice had anal sex. She had also told Benitez that, on April 11, 2006, defendant had hugged and kissed her and had sex with her in his car. K. had told Benitez that she had "no clue" how many times they had sex, but she guessed it might have been 40 to 90 times.

The prosecution presented evidence at trial of defendant's relationships with several other young women. C. testified that in 2006, when she was 16 years old, she had a profile on MySpace. Her profile stated that she was in high school but did not disclose her actual age. She received a flirtatious message on MySpace from defendant. C. replied to his message and gave him her telephone number. He telephoned her and suggested that they meet up and drink alcohol. Defendant told C. that he was 23 years old. C. did not agree to meet up, and she never spoke to defendant again.

B. testified that defendant sent her a message through MySpace in November or December 2005 when she was 16 years old. Her MySpace profile stated that she was 16 years old. After she replied to defendant's message, B. looked at defendant's MySpace profile, which stated that he was 19 years old. They met and went to see movies twice. B. told him she was 16 years old. Defendant hugged her, kissed her, and held her hand. After their first date, defendant disclosed to her that he was really 22 years old. On their third and fourth dates, defendant touched her breasts, and they engaged in "[f]rench kissing." After their second or third date, defendant asked B. if she was a virgin and if she was interested in sex. On their third date, he asked her if she wanted to have sex. She said she was not ready for that. At some point, defendant asked B. to give him a "'blow job,'" but she declined. During their fourth date, defendant asked her if she "wanted to try giving him a hand job." She agreed and massaged his penis until he ejaculated.

S., an adult, testified that defendant was her "very good" friend. S. had a teenage daughter A. and a younger son. When S. met defendant, A. was 14 years old. A. developed a "crush" on defendant. At some point, S. told defendant to "back off" of A. because he was attracted to A. A. testified that defendant kissed her, with "tongues involved," when she was 15 years old. A. told him that she did not want a relationship, and they had no further romantic interactions.

5

Defendant testified at trial on his own behalf. He admitted that he had a MySpace profile and that he searched profiles on MySpace in order to make contact with "[y]oung women usually between the ages of 16 and 23 or 16 and 25." Defendant testified that he never searched for anyone under the age of 16, but he conceded that the MySpace system did not permit such searches. He admitted that he specifically searched for underage girls and that he frequently lied about his own age and said he was 17 years old. Defendant explained that he had found that girls "under 18" were more receptive and less likely to reject him. Defendant sent messages to more than 50 girls whose profiles he found through MySpace searches, and he met up with 15 to 20 of them.

Defendant insisted that he "made sure I didn't date any girls under 16 because I felt that was too young." When the prosecutor asked him how he would "know" a girl's age, defendant asserted "I would ask them their ages, and they would tell me." Yet he admitted that he had never asked K. her age, and he claimed this was because she had put her age on her MySpace profile.

Defendant testified that, in late September 2005, he encountered K.'s MySpace profile on which she had listed her age as 16. He thought she looked 16, and he sent her a message. They then talked over the telephone and arranged to meet. They met within a week. Defendant "thought she was pretty" and "attractive." He felt "affection" for her "in a romantic way." Defendant testified that, at this first meeting, he admitted to K. that he had lied about his age on his MySpace profile because he "wanted to portray myself as someone who was 17, so I did." He told her that he was really 22 years old. "I was 22 at the time, so I didn't feel it was abnormal for me to be dating a 16 year old . . . ." He insisted: "I had no idea she was 12 years old. I thought she was 16." Defendant admitted that he initiated kissing on that first occasion. He was not sure if he "french kissed" K. on this first occasion or not until the second time they met. He admitted that they held each other closely as they lay on the sleeping bag in the park on that first occasion.

After that first meeting, they met "[a]round ten times" over about a month. Defendant and K. would go to the park and talk. Every time they met, defendant kissed and hugged K. Defendant claimed that the hugs and kisses were not "sexually motivated" and there "wasn't anything sexual about it." He insisted that the hugging and kissing was "[n]ot in a sexual way" was not "motivated by sex." Defendant testified that K. had not disclosed to him during that period that she was not 16 years old. Defendant claimed that K. told him she was in the 11th grade and attended a private high school.

Defendant described how, at the beginning of November, K. snuck out of her house at midnight, and defendant met her and drove her to his house. They went into his bedroom, sat on his bed, and hugged and kissed, including "French-kissing." He testified that K. asked him if he had a condom, and he "took this to mean she wanted to have sex" with him. He was "equally interested in" having sex with her. He got a condom, and they undressed and had sex. They had sex only one time that night. While they were having sex, they continued kissing. Defendant admitted that he kissed K. "[s]omething like" five times that night. He drove her home later that evening, and he hugged and kissed her goodbye before dropping her off. They got together again within a week and again had sex at his house. When he picked her up that night, defendant hugged and kissed her. The second sexual encounter was similar to the first one. They hugged and kissed, including french kissing, and then they had sex. While they were having sex, the kissing continued, as it had the first time.

Defendant claimed that he did not learn that K. was 12 until after the second time they had sex. After he drove her back to her house that night, before she left his car, K.

6

told him that she was 12 years old. He was "shocked" and "didn't want to believe it." He "wouldn't have sex with her after that, after learning that." He told her "this is over," and "I cannot see you anymore." K. was very upset and wanted to continue their relationship. She threatened to "turn me in" and "consider suicide" if he stopped seeing her. Because he "cared about her very much" and was worried that she would "turn me in," he agreed that they could "still talk" and "hang out every now and then," but he refused to continue "a relationship." He testified: "If I had never found out she was [12], I would have kept seeing her."

Defendant continued to see K. from November 2005 to April 2006, but he claimed that he did not kiss her and only gave her a hug to greet her. He estimated that they met only four to eight more times. He had no further "sexual contact" with K. In December 2005, she told him that she had been hospitalized after she "had almost gone through with" killing herself. Defendant continued to meet her and talk to her "a lot on the phone" although he was "trying to distance" himself from her.

Defendant admitted that he had brought a bottle of champagne with him to a meeting with K. on Valentine's Day 2006 and had shared the champagne with K. He claimed he did this because he "didn't want to piss her off" and "didn't want her to kill herself." He testified that K. was "very obsessed with me," and "had a lot of dirt on me." Later that month, K. called him and said she had been hospitalized again after attempting suicide.

On April 10, 2006, K. telephoned defendant and told him she had been released from the hospital after another suicide attempt. She wanted to see him, and defendant agreed to meet her the next day. They met the next day and "hung out" and "talked a lot" in his car, but they "were strictly friends." He went into rehab a few days later. On May 7, while he was in rehab, he talked to K. on the phone and told her that he "didn't want to see her at all after that." He claimed that she "took it really, really bad." He did not hear from her for a month after that, and he "was hoping that there wasn't going to be any relationship" between them. He "didn't want to see her anymore."

Defendant denied that K. had ever orally copulated him or that they had ever had anal sex. He also denied that he had ever touched K.'s breasts, claiming that she always refused to remove her bra. He denied that he had ever been in K.'s house. Defendant claimed that K. was lying about the extent of their relationship because "she enjoys the attention" and "gets to play the victim." Defendant maintained that his only "sexually motivated" acts with K. were the two acts of sexual intercourse.

Defendant denied that he had used the word "sickness" when he spoke to his mother about his attraction to younger girls. He simply told her that he was "interested in girls younger than me," which he did not consider a "problem." He saw no problem with dating 16-year-old girls. Defendant also denied telling his mother that he wanted to have sex with younger girls. He admitted that he had kissed A., but he claimed that she was 16 years old when that occurred. Defendant conceded that his french-kissing of A. was a "sensual" kiss, but he also claimed that he had no "sexual interest" in A. and that his kiss "wasn't sexually motivated at all." He also admitted the conduct B. had described, which he said began in December 2005 or January 2006. He did not significantly challenge C.'s testimony about their brief interaction.

Defendant's trial counsel conceded in his closing argument that defendant was guilty of two counts and that those two counts "involve substantial sexual conduct." He argued that K. was "exaggerati[ng]" about the number of instances of sexual intercourse. "[I]t just didn't happen that many times. It didn't happen 34 other times or at least the prosecution hasn't been able to prove those other 34 times" (Exh. 6 at 2–13) (footnotes omitted).

7

## ANALYSIS

### 1. STANDARD OF REVIEW.

Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may not grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. 2254(d).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court, which in this action is that of the California Court of Appeal. *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005). AEDPA imposes a "highly deferential" standard for evaluating state court decisions. *Woodford v. Wiscotti*, 537 U.S. 19, 24 (2002). A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. 2254(e)(1). This presumption is not altered by the fact that the finding was made by a state appellate court, rather than by a state trial court. *Sumner v. Mata*, 449 U.S. 539, 546 47 (1981).

Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law

8

erroneously or incorrectly. Rather, that application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003). "While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a great[] degree of deference to the state courts." *Clark v. Murphy*, 331 F.3d 1062, 1068 (9th Cir. 2003).

Under the "unreasonable determination of the facts" clause, a state court's ruling based on a factual determination must be "'objectively unreasonable' in light of the record" to warrant habeas relief. *Miller-El v. Cockrell*, 537 U.S. 322, 348 (2003). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

### 2. CLAIMS FOR RELIEF.

Petitioner advances two claims for relief. *First*, petitioner claims in his petition that his due process rights under the Fourteenth Amendment were violated because "California requires a unanimous jury verdict in a criminal trial, and that a California conviction obtained without jury unanimity violates federal due process" (Dkt. No. 1 at 22–23). Petitioner argues that "the record in the instant case establishes beyond a reasonable doubt that the jury was not unanimous as to which act constituted the charged crimes in counts 3 through 20, and this lack of state-required unanimity of twelve jurors constitutes a violation of the Due Process Clause of the Fourteenth Amendment" (*id.* at 31). *Second*, petitioner contends that the trial court's admission of his mother's testimony, which allegedly characterized him as a sexual predator, violated due process and his right to meaningfully present a defense. This order will address each in turn.

#### A. Alleged Lack of Unanimity.

The jury found petitioner guilty of counts 1 through 20 of lewd and lascivious acts on a minor under the age of 14 and found that petitioner engaged in "substantial sexual conduct" for counts 1 and 2. For counts 3 through 20, however, the jurors left blank the section for the special findings of substantial sexual conduct. Petitioner argues in his habeas petition that jurors were told by the trial court judge that they could leave the special findings on the verdict forms blank "only if they were unable to arrive at a unanimous agreement on those special allegations" (*id.* at 25). Thus, petitioner concludes that jurors did not unanimously agree on whether petitioner

9

engaged in substantial sexual conduct for counts 3 through 20 and those counts should therefore be invalidated. The California Court of Appeal found the jury's verdicts on counts 3 through 20 to be facially unanimous.

As a threshold matter, there is no federal constitutional right to a unanimous jury verdict. *Apodaca v. Oregon*, 406 U.S. 404, 410-412 (1972). When a state guarantees a structural protection, however, it violates due process to deny that guarantee. *Evitts v. Lucey*, 469 U.S. 387, 400-01 (1985). California law provides that a jury verdict in a criminal case must be unanimous and that the jury must unanimously agree that the defendant committed the same criminal act. *People v. Engelman*, 28 Cal.4th 436, 442 (2002). Petitioner's state right to a unanimous jury verdict, however, was "meaningfully vindicated" here.

Petitioner must do more than merely disagree with the California Appellate Court's determination of the facts. Under 28 U.S.C. 2254(d)(2), petitioner must show that the state court's ruling is "'objectively unreasonable' in light of the record" to warrant habeas relief. *Miller-El v. Cockrell*, 537 U.S. 322, 348 (2003). Where "reasonable minds reviewing the record might disagree," on habeas review "that does not suffice to supersede" a state court factual finding. *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). Here, the California Appellate Court found that the jury's guilty verdicts on counts 3 through 20 were unanimous on their face because the "jurors explicitly and implicitly affirmed both individually and collectively, orally and on the written verdict form, that their verdicts were unanimous" (Exh. 6 at 26). It also affirmatively rejected petitioner's claim that the jury could not agree about whether petitioner engaged in substantial sexual conduct for counts 3 through 20 because the claim was based on "multiple inferences" that were not supported by the record (*ibid.*). Indeed, the California Appellate Court states that even if petitioner is arguing that the jury "could not disagree about whether a particular lewd act constituted substantial sexual conduct without also disagreeing about the nature of the lewd act . . . [and thus] conten[ding] that the jury's verdict . . . was inconsistent . . . ," California law allows juries to return inconsistent findings *within a single count* because the inconsistent findings "frequently result from leniency, mercy, or confusion,"

10

rather than a lack of jury unanimity (*id.* at 29) (citing *People v. York*, 11 Cal.App.4th 1506 (1992)).

The trial court informed the jury that "it is possible that you could come back with blank verdicts because there is just not an agreement on guilty or not guilty or there is not an agreement on true or not true" (Reporter's Tr. at 2413). The trial court did not tell the jury that they could return blank verdicts or blank findings *only if* they cannot agree. Moreover, the California Appellate Court noted that petitioner's trial counsel told the jury that if it finds "that there's no substantial sexual conduct, *you don't fill that special finding out*" (*id.* at 2143). Thus, the jurors could have been "confused by the conflicting advice about how to fill out the forms regarding the special findings" (Exh. 6 at 27). Thus, petitioner's inference about the lack of jury unanimity is unwarranted.

Petitioner also cites to the concurring and dissenting opinion to the California Appellate Court decision, which argued that the jury would have affirmatively found true or not true the special allegations to counts 3 through 20 if they were unanimous (Exh. 6, Concurrence & Dissent at 12–14). The concurring and dissenting opinion state that the victim "testified to more than a hundred instances of acts constituting substantial sexual conduct" and that "the jury's inability to reach a decision on the nature of the 18 charged acts following long hours of discord" suggest a lack of jury unanimity for the 18 substantial sexual conduct allegations at issue (*ibid.*). The record, however, does not support this conclusion as the jurors never stated that they returned the special allegations blank because they were unable to agree. In fact, the concurring and dissenting opinion concedes that its analysis does not "attempt to divine the truth of substance" about any dispute that occurred during jury deliberations, but rather that the dispute occurred at all (*id.* at 17 n.9). Thus, it can merely *speculate*, without conclusively proving, that the jury was unable to agree about the 18 substantial sexual conduct allegations at issue. The jury, however, is presumed to follow its instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Moreover, the California Appellate Court noted that the trial court gave the jury a unanimity instruction and reiterated the unanimity requirement multiple times during deliberations (Exh. 6 at 14–15, 17, 20–21; Reporter's Tr. at 2165–66). Presuming that the jury

11

followed the trial court's multiple jury instructions is not unreasonable. Finally, the trial court polled the jurors individually and each juror affirmed that he or she had returned a verdict according to the unanimity instruction (Reporter's Tr. at 2521–30).

It was not unreasonable or contrary to established law for the California Appellate Court to determine that the jury's verdicts on counts 3 through 20 were facially unanimous. Thus, petitioner's claim is **DENIED**.

### B. Propensity Evidence.

Petitioner also argues that the trial court's admission of his mother's testimony allegedly characterizing him as a sexual predator violated due process and his right to a meaningful opportunity to present a defense. The California Court of Appeal rejected petitioner's argument, stating:

> Defendant makes the mistake of viewing his mother's "predator" statement as solely a statement of her opinion of his character, rather than as her colorful description of the nature of the acts she observed him engaging in. She did not testify or state to Benitez that she believed that defendant was a predator. Benitez testified that defendant's mother told him she saw defendant trolling MySpace for underage girls and described this conduct as "being a predator" (italics added). While the distinction is a fine one, it is an important one with respect to the application of [California]
> Evidence Code section 1101. Defendant's mother's "predator" statement was inadmissible as evidence of his character (Evid. Code, § 1101, subd. (a)), but it was properly admissible as evidence of the nature of defendant's acts to show the intent (Evid. Code, § 1101, subd. (b)) he harbored as to underage girls . . . (Exh. 38–39).

Petitioner's character evidence claim fails because no remediable constitutional violation occurred. *First*, the United States Supreme Court has left open the question whether admission of propensity evidence violates due process. *Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991). Because the Supreme Court has reserved this issue as an "open question," our court of appeals has held that a petitioner's due process right concerning the admission of propensity evidence is not clearly established for purposes of review under AEDPA. *Alberni v. McDaniel*, 458 F.3d 860, 866-67 (9th Cir. 2006). *Second*, even if the evidence were irrelevant or prejudicial, the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).

12

In this Court's view, the mother's "predator" comment should never have been allowed into evidence over objection. It was not based on first-hand observation. Even if it was based on what her son had said to her directly, it was an opinion and an inflammatory one at that. It should never have been allowed to inflame the jury, much less to lead to a 44-year sentence, an exceedingly long sentence for the conduct here involved. Still, no United States Supreme Court decision barred its use. AEDPA forbids relief on this ground. The California Court of Appeal's rejection of petitioner's claim was not contrary to, or an unreasonable application of, clearly established Supreme Court law. Accordingly, petitioner's claim is **DENIED**.

## CONCLUSION

The petition for a writ of habeas corpus is **DENIED**. Judgment will be entered in favor of respondent and against petitioner.

A certificate of appealability will not be issued. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the Court of Appeals. **THE CLERK SHALL CLOSE THE FILE**.

**IT IS SO ORDERED.**

Dated: October 21, 2013.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE